HODGES and others, Respondents, vs. NALTY, Appellant.

*February 22—March 11, 1902.*

*Subscriptions: Signature: Adopted name: Contracts made on Sunday: Evidence:* Res gestæ: *Appeal and error: Special verdict: Instructions to jury: Immaterial error: Notice of withdrawal of subscription.*

1. A person may adopt whatever name he pleases in his business dealings, and, if he uses such adopted name, he will be bound by it.

2. Where N., to evidence his engagement in subscribing money to build a church, signed the words "N. family $1,000," he cannot be heard to say that such subscription is meaningless or void for uncertainty.

3. Under sec. 4595, Stats. 1898, forbidding work or business on the first day of the week, except works of necessity or charity, a subscription of money to build a church is not invalid because it was made on Sunday.

4. Where defendant and others subscribed at the same time for the building of a church, evidence as to the circumstances under which the others made their subscriptions is admissible as part of the *res gestæ*.

5. In an action to recover on a subscription towards building a church, the substantial questions at issue were, whether the original scheme for building the church had been abandoned, and, a new priest having taken charge of the parish, whether a new plan had been entered upon. *Held*, that a question of a special verdict,—whether the new priest announced to the congregation that any subscriber to the building fund might have his notes returned if he so desired,—related to a collateral circumstance wholly undecisive of the real issues involved, and instructions to the jury in relation to such question should be disregarded, unless it can be said that they probably influenced the jury's action in answering other questions in the verdict.

6. Defendant in January subscribed to build a church, on condition that a certain aggregate amount should be subscribed. Others, relying on his subscription, also subscribed, and a building committee was appointed, of which defendant was treasurer. He continued in that office until August 1st, when he resigned, and on August 29th he turned over the money he had collected to his successor. The priest of the parish was also a member of the building committee. Dissensions having arisen, such priest assumed an adversary position against other members of the building committee, in which defendant joined. *Held*, that defendant's notice to such priest, given before August 1st, of his intention to withdraw his subscription was not notice to the committee.

7. Under such circumstances advertisement for bids was made about the middle of August, the contract for erecting the church let in September, and the building completed the following spring. The amount collected, including defendant's subscription, exceeded the aggregate amount on which his subscription was conditioned. The original plan of building the church was never abandoned. *Held*, that the delay in performing the conditions on which defendant's subscriptions had been given was not unreasonable.

APPEAL from a judgment of the circuit court for Green county: B. F. DUNWIDDIE, Circuit Judge. *Affirmed.*

This is the second appearance of this action in this court. It first came here on an appeal from an order overruling a demurrer to the complaint. 104 Wis. 464. The action is based upon a subscription made by defendant, with some seventy-five other persons, for the purpose of building a church. The signature to the subscription signed by defendant was as follows: "Nalty Family, $1,000." The answer admits the signing of the subscription paper in manner and form as stated; sets up that it was made on the condition that other members of the church should make contributions, which, with the amounts subscribed by the committee of which defendant was a member, should make the amount of $10,000. Before August 1, 1892, it was found that many of the members would not pay, and it was then understood that such subscriptions were canceled. Defendant resigned from the committee before any liability had been incurred, and has since had nothing to do with the building of the church. The evidence shows that after the committee had been selected several meetings were held, and it was voted to build a church building to cost not less than $10,000, and that subscriptions therefor were secured on condition that, with the insurance money on hand of about $3,000, the sum of $10,000 should be collected. It is shown beyond dispute that said sum, including defendant's subscription and one made by the priest, Father O'Brien, was secured, and has nearly all been collected, except the two subscriptions last mentioned. The church building was commenced during the fall of 1892, and finished some time in 1893. After the project had been launched, the defendant, the priest, and other members of the committee were active in securing subscriptions, and quite a large sum was raised. Before the entire amount had been secured, troubles and dissensions arose between the priest and his congrega-

tion and some of the members of the committee. The priest
was removed to another parish, and the defendant resigned
from the committee. When the new priest came, the project
was taken up and carried forward with the result before
stated. On the trial the defendant claimed that he notified
the building committee and the congregation that he would
not be bound by his subscription, that the original scheme
had been abandoned, and that after the new priest came a
new one was instituted without reference to his subscription.
The jury returned the following special verdict:

"1. Did the defendant, at that meeting in January, '92,
in consideration of the promises then made by others present
at said meeting, and also in consideration of subscriptions
which he then hoped might thereafter be secured from others
not present at said meeting, undertake and agree to raise
and pay $1,000 to aid in the building of a church subject
to the conditions expressed in the resolutions passed at that
meeting? *A.* Yes.

"2. Did other members of the committee then present
promise to pay the sums of money then and there named by
them in reliance upon any promise of the defendant to raise
and pay the sum of $1,000, subject to the conditions ex-
pressed in the resolutions passed at said meeting? *A.* Yes.

"3. Did the defendant, at any time on or before August
1, 1892, notify the building committee of the congregation
that he would not pay his subscription made January 31,
1892? *A.* No.

"4. Did the defendant, on or before August 1, 1892,
notify Father O'Brien that he would not pay his subscrip-
tion made in January, 1892? *A.* Yes.

"5. If you answer the third question 'Yes,' then answer
this question: Did the building committee consent to the
refusal of the defendant to pay his subscription made in
January, 1892? *A.* ——.

"6. Did Father O'Brien announce to the congregation, be-
fore his departure, that he would not pay his notes, and that
he knew of another subscriber who would not pay? *A.* No.

"7. Had the sum of $10,000, inclusive of the $3,000 in-
surance money and the subscription of the defendant, been

collected for the building of a church before August 1, 1892? *A.* Yes.

"8. Had the building committee incurred any liability to Mr. Mansfield for plan prior to July 31, 1892, in reliance upon the subscriptions of the defendant and others? *A.* Yes.

"9. Did Father Dempsey, at the first or second public Sabbath service held after his coming, make any announcement to the congregation in effect that any subscriber to the building fund might have his notes returned if he so desired? *A.* No.

"10. Was it understood by the building committee of St. Victor's, when Father Dempsey made some statement in reference to notes which had been given by members of the congregation, that the plan for raising the necessary fund to build the church in question in January, 1892, had failed? *A.* No.

"11. Was a new plan entered upon by the building committee to raise the necessary funds to build the new church after Father Dempsey became pastor of the congregation? *A.* No.

"12. In the event that the court determines that the plaintiffs are entitled to recover, at what sum do you assess their damages? *A.* $1,000."

After the jury had been out for some time, they came in, and requested further information and instructions regarding question No. 9. A number of exceptions were taken to the instructions thus given, and are preserved in the record. The defendant moved to strike out the answers to questions 1, 2, 7, and 8, and for judgment in his favor. The court struck out the answers to questions 7 and 8, and denied the motion in other respects. Defendant moved for a new trial, which was denied. Defendant also moved for judgment on the verdict as amended, which was denied. Due exceptions to the denial of each motion were taken. Judgment was directed for plaintiffs upon the verdict as amended. The defendant appeals from the judgment.

For the appellant there was a brief by *A. S. Douglas,*

*Spensley & McIlhon* and *P. A. Orton,* and oral argument by *Mr. Orton* and *Mr. Calvert Spensley.*

For the respondents there was a brief by *Colin W. Wright* and *Jones & Stevens,* and oral argument by *Mr. Wright* and *Mr. B. W. Jones.*

BARDEEN, J.  1.  The complaint in this action seems to have been based upon the theory that the agreement of defendant shown by the subscription paper was his absolute engagement to pay the sum specified.  He now seeks to avoid liability by claiming that it is meaningless and void for uncertainty.  He admits that he made the subscription, and that he went out to obtain subscriptions from others, and that he talked with them as to the amount he was to pay.  He also says that he told others that, if they did not pay the amount the committee had assessed for them to pay, he would not pay the sum he had pledged.  He knew that it was generally understood that he had made the subscription, and that it was being used to influence others to contribute.  He told one witness he had signed more than he intended to, but that he "would pay as much as Hodges paid if it took the last dollar."  He did not want the smaller subscriptions put on the paper, because he wanted to take it to some of the well-to-do citizens who were not Catholics, as he thought he could get a liberal subscription from them.  There is no possible question but that the defendant made the subscription intending to bind himself personally, and that all the others interested so understood it.  A person may adopt whatever name he pleases in his business dealings, and, if he uses such adopted name, he will be bound by it.  1 Daniell, Neg. Inst. § 252.  In *Salomon v. Hopkins,* 61 Conn. 47, Chief Justice ANDREWS uses this language:

"It is a familiar principle that a man, either in his general dealings or in a particular transaction, may adopt whatever name he chooses, and he will be bound accordingly."

In *Pease v. Pease,* 35 Conn. 131, the syllabus reads:

"A party can adopt a name, and will be held by contract executed in such name, and it makes no difference that the name so assumed is not an artificial one, but is the proper name of a living person."

See *Williamson v. Johnson,* 1 Barn. & C. 146; *Lindus v. Bradwell,* 57 Eng. C. L. 583; *Cooper v. Meyer,* 10 Barn. & C. 468; *Rex v. Dunn,* 1 Leach, 57; *Merchants' Bank v. Spicer,* 6 Wend. 443; *Melsheimer v. Hommel,* 15 Colo. 475. The defendant, having used the name "Nalty Family" to evidence his engagement for the benefit of the church, is bound thereby, and cannot be heard to say that it is meaningless or void for uncertainty.

2. The subscription was made on Sunday, and is said to have been forbidden by sec. 4595, R. S. 1878. This section prohibits any work or business on the first day of the week "except only works of necessity and charity." This question has never been definitely determined in this state. So far as any authority can be found elsewhere, the cases generally unite in holding such subscriptions to come within the exceptions of the statute. *First M. E. Church v. Donnell,* 110 Iowa, 5; *Bryan v. Watson,* 127 Ind. 42; *Allen v. Duffie,* 43 Mich. 1; *Dale v. Knepp,* 98 Pa. St. 389. We approve of the decisions cited, and hold that the subscription is not invalid because it was made on Sunday.

3. Evidence was offered and received at the trial as to the circumstances under which Father O'Brien made his subscription. This is claimed to have been prejudicial to the defendant. The subscriptions of Hodges, O'Brien, and defendant were all made at one time, and were parts of a single transaction. Such testimony was clearly admissible as a part of the *res gestæ,* and we can see no ground upon which it can be claimed that the defendant's interests suffered by its introduction.

4. After the jury had been out some time, they returned

into court, and asked further instructions as to the ninth question of the verdict. This question related to the fact of whether Father Dempsey had, at a time specified, announced to the congregation that any subscriber to the building fund might have his notes returned to him if he desired. The instructions given were somewhat confused and involved, and left the jury without any very definite guide in their deliberations. We are satisfied, however, that the question to which they were directed was of no importance in this case. An answer to it would not have determined any issue involved, or have aided the court in giving a proper judgment. It related to a collateral circumstance wholly undecisive of the real issue involved. The substantial questions at issue, and which were covered by the tenth and eleventh questions of the verdict, were whether the original scheme for building the church had been abandoned, and a new plan had been entered upon, when Father Dempsey took charge of the parish. If the original plan had been given up before Father O'Brien left, then, of course, the defendant could not be held on his subscription. The circumstance that when Father Dempsey came he did or did not make the announcement claimed was of no importance. It was a mere evidentiary matter, not at all decisive of the real question at issue. The question was therefore wholly immaterial, and ought not to have been included in the verdict. Such being the case, the instructions complained of may be disregarded, unless we can say that they probably influenced the jury's action with reference to their answer to other questions in the verdict. A careful review of the situation convinces us that such could not have been the result.

5. Upon motion of defendant the court struck out the answers to questions 7 and 8. These questions are supposed to have some bearing upon defendant's legal liability in this action. Defendant's subscription was based upon the condition that, inclusive of the $3,000 insurance money held by

the church, the amount collected to build the building should equal $10,000. The jury answered to the seventh question that this sum had been collected before August 1, 1892. There is no evidence to support any such finding. The answer was properly set aside. In answer to the eighth question the jury found the building committee had .incurred liability to the architect for plans prior to July 31, 1892, in reliance upon the subscriptions of the defendant and others. Presumably, the court set the answer aside as being contrary to the evidence. This question was of no importance in the case except upon the theory that defendant could not withdraw his subscription after the other party had incurred obligations in reliance thereon. This question becomes unimportant in view of our conclusions on the question of revocation.

6. Ought judgment upon the verdict as amended to have been for the defendant? Briefly stated, the verdict finds that defendant undertook to raise and pay $1,000 to aid in building the church; that other members of the committee made subscriptions in reliance thereon; that the original plan of building the church was never abandoned; and that defendant never notified the committee or the congregation before August 1, 1892, that he would not pay his subscription, but that he did notify Father O'Brien. This is the substance of the verdict as it stood after it was amended. There is no finding that the sum mentioned in the subscription paper had ever been collected, or that the church had ever been built. We think the evidence conclusively shows that the church was built at a cost exceeding $11,000. It also shows that there has been collected in cash toward paying for the building $9,978.32. This sum, with defendant's subscription, exceeds the amount required to be raised under the terms of the original agreement. These facts being shown by the undisputed evidence, the case may be considered on the basis as though expressly found by the

jury. We have here every element of an agreement binding upon the defendant, unless we can say his notification to Father O'Brien- that he would not pay his subscription released him therefrom. One answer to this proposition is that a notice to Father O'Brien was not notice to the committee or to the congregation. Conceding, for the purpose of the discussion, that defendant might have relieved himself of liability by a timely notice of revocation of his subscription to the interested parties, such notice must have been of such a nature as to clearly indicate an intention to revoke his subscription, and must have been brought home to the committee in charge of the scheme or to the congregation in such a way as to clearly inform them of such intention. We do not think it was necessary to notify each member of the committee or congregation, but it should have been sufficiently definite and notorious as to bring the fact of revocation clearly to their attention. We do not think the notice to· Father O'Brien, under the circumstances of this case, was such notice. He was only one member of the committee. It appears that early in the spring of 1892 trouble and dissension arose in the church and in the committee between them and the priest. It resulted in the latter being transferred to another parish. Before such transfer took place, the priest attempted to secure his release from his obligations. The defendant sided with the priest. Both were evidently actuated by the same purpose. They assumed, in a measure, an adversary position as against the others. While standing in that attitude, if the defendant desired to relieve himself from the obligations of his subscription it was necessary that he bring that desire home to other members of the committee, or to those for whom they were acting. The former decision in this case (104 Wis. 467) distinctly says that the liability of each subscriber was a several liability, and not joint; hence a notice to one subscriber was not notice to all. They were not each agents for the

other, so that notice to one would be imputed to all. The rule of imputed knowledge is enforced for the protection of innocent third parties. It cannot be appealed to, even in a proper case, where the circumstances are open to the charge of collusion. *Nat. L. Ins. Co. v. Minch,* 53 N. Y. 144. See *Allen v. South Boston R. Co.* 150 Mass. 200. If it were conceded that the relation between the parties is as contended for by defendant, we should be reluctant to hold the alleged notice good in this case. Both the priest and the defendant were members of the building committee. They were acting out of harmony with the others, to put the case mild. To say that one might give notice to the other, and thus bind the whole committee, smacks too much of collusion to be tolerated. We decline to sanction any such proposition. It is a fact clearly shown by the evidence that the church has been built in partial reliance upon defendant's subscription. This shows an implied acceptance of his proposition, and, there being no claim of revocation except the notice to the priest hereinbefore referred to, his duty to pay became absolute. Upon the assumption that the subscription might be revoked at any time before acceptance, we find nothing in the case to sustain the claim of a legal revocation. But it is said that such acceptance was not made within a reasonable time. The subscription was made the latter part of January, 1892. Very soon thereafter the committee went to work to secure other subscriptions. The matter dragged along until the trouble between the priest and his congregation arose. The priest was removed, and his successor immediately took up the project. The jury have found that the original project had not been abandoned. In August a new start was taken, and plans for the church were secured. The defendant continued to be treasurer of the committee until the last day of July, and finally turned over the funds in his hands the 29th day of August. Bids were advertised for about the

middle of the month, and the contract was directed to be let at a meeting held September 25th. The building was completed in the spring of the following year. Under the circumstances we cannot say, as a matter of law, the delay was unreasonable.

· Extended argument has been made by defendant's counsel attacking the rule of law established by the case of *Lathrop v. Knapp,* 27 Wis. 214. This is based upon the assumption that there had been a revocation of defendant's subscription before there had been an acceptance. Having concluded that no legal revocation has been shown, we find it unnecessary to enter into a review of principles of law laid down in that case. It must be admitted that there is some confusion among the cases concerning the grounds, as well as the nature and extent of the liability of subscribers in cases like this. The following cases may be cited as tending to support the rule of the *Lathrop Case: Northwestern Conference v. Myers,* 36 Ind. 375; *Petty v. Trustees,* 95 Ind. 278; *Bryan v. Watson,* 127 Ind. 42; *Comstock v. Howd,* 15 Mich. 237; *Allen v. Duffie,* 43 Mich. 1; *First Universalist Church v. Pungs* (Mich.), 86 N. W. Rep. 235; *Homan v. Steele, J. & Co.* 18 Neb. 652.

*By the Court.*—The judgment is affirmed.